IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. |
| | ) | |
| | ) | |
| | ) | |
| GRIMMEL INDUSTRIES, INC., | ) | |
| GRIMMEL INDUSTRIES, L.L.C., and | ) | |
| GARY GRIMMEL, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## COMPLAINT

Plaintiff, the United States of America ("United States"), by authority of the Attorney General of the United States and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), by and through their undersigned attorneys, with respect to claims under federal law, allege as follows:

1.     This is a civil action for injunctive relief and civil penalties brought pursuant to Sections 309(b) and (d) and 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d) and 1321(b)(7), against Grimmel Industries, Inc. ("Grimmel Inc."), Grimmel Industries, L.L.C. ("Grimmel L.L.C."), and Gary Grimmel (collectively "Defendants" or "Grimmel") for failing to comply with the conditions of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342 and for failing to properly maintain and fully implement its Spill Prevention Control and Countermeasure ("SPCC") Plan in accordance with the Oil Pollution Prevention regulations set forth at 40 C.F.R. Part 112, promulgated under the authority of Section 311 (j) of the CWA, 33 U.S.C. § 1321(j).

## JURISDICTION

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and 33 U.S.C. § 1319(b).

3.      Venue is proper in this district pursuant to 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391 and 1395, because Defendants conduct business in this District, and because the violations occurred in this District.

4.      Notice of the commencement of this action was given to the State of Maine in accordance with 33 U.S.C. § 1319(b).

5.      Authority to bring a civil action is vested in the Attorney General of the United States pursuant to Section 506 of the CWA, 33 U.S.C. § 1356, and 28 U.S.C. §§ 516 and 519.

## DEFENDANTS

Grimmel Industries, Inc.

6.      Grimmel Inc. is a corporation organized and existing under the laws of Maine, whose principal place of business is located at 80 Pejepscot Village, Topsham, Maine.

7.      Grimmel Inc.'s Articles of Incorporation were filed by the Maine Secretary of State's office on March 30, 2009.

8.      Grimmel Inc. also does business as Grimmel Ind. Car Crushing.

9.      Grimmel Inc. operates a scrap metal recycling operation located at 80 Pejepscot Village, Topsham, Maine (the "Topsham Facility").

10.      Grimmel Inc., also operates a scrap metal recycling operation located at 50 River Road, Lewiston, Maine (the "Lewiston Facility").

11.     Grimmel Inc. is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

Grimmel Industries, L.L.C.

12.     Grimmel L.L.C., is a limited liability company organized and existing under the laws of Maine.

13.     Grimmel L.L.C.'s Articles of Organization were filed by the Maine Secretary of State's office on February 18, 2000.

14.     Grimmel L.L.C. recycles scrap metal.

15.     Grimmel L.L.C. is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

16.     In response to an information request sent by EPA, on September 27, 2011, Grimmel L.L.C. admitted that it has the following affiliated entities: Grimmel Ind., Inc.; Grimmel Industries, L.L.C. d/b/a Portsmouth Trading; Grimmel's Car Crushing, LLC; Pejepscot Industrial Park, Inc.; Kennebec Scrap Iron, Inc.; and T&T Express, Inc.

Gary Grimmel

17.     Gary Grimmel is the President of Grimmel Inc.

18.     Gary Grimmel is the majority owner of Grimmel Inc.

19.     Gary Grimmel is an organizer, manager, member, and owner of Grimmel L.L.C.

20.     Gary Grimmel is an organizer, manager, member, and owner of Grimmel's Car Crushing, LLC.

    a.  Grimmel's Car Crushing, LLC, is a limited liability company organized and existing under the laws of Maine, whose Articles of Organization were filed by the Maine Secretary of State's office on March 18, 2009.

    b.  Grimmel's Car Crushing, LLC invests and manages real estate.

## STATUTORY AND REGULATORY AUTHORITY

21.    The Clean Water Act is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

22.    To accomplish the objectives of the CWA, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person except in compliance with certain Sections of the CWA, including, where applicable, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

23.    Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."

24.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, solid waste, chemical wastes, wrecked or discarded equipment, rock, sand, and industrial waste discharged into water.

25.    Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States."

26.    "Waters of the United States" have been further defined to include, among other things:  (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; and (ii) tributaries of such water.  See 40 C.F.R. § 122.2

and 73 F.R. 71941 (2008).

27.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines a "point source" as including "any discernible, confined and discrete conveyance including but not limited to any pipe, ditch, channel, conduit, well … [or] container … from which pollutants are or may be discharged."

28.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires a permit for storm water discharges associated with industrial activity.

29.     EPA regulations define the term "storm water discharge associated with industrial activity" to include storm water discharges from facilities involved in the recycling of metals, including metal scrapyards classified as Standard Industrial Classification 5093.  40 C.F.R. § 122.26(b)(14)(vi).

30.     Section 308(a) of the CWA, 33 U.S.C. § 1318(a), authorizes the Administrator of the EPA to require the owner or operator of any point source to provide such information as the Administrator may reasonably need to carry out the objectives of the CWA, including the NPDES permit program of  CWA Section 402, 33 U.S.C. § 1342.

31.     Pursuant to Sections 308 and 402 of the CWA, 33 U.S.C. §§ 1318 and 1342, EPA promulgated storm water discharge regulations at 40 C.F.R. § 122.26.

32.     Pursuant to CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and EPA's implementing regulations at 40 C.F.R. § 122.26, a storm water discharge associated with industrial activity is prohibited except as authorized by an NPDES permit.

33.     On September 29, 1995, EPA issued an NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("1995 MSGP").  EPA re-issued the Multi-Sector General Permit for Industrial Activities on October 30, 2000 ("2000 MSGP"), 65 Fed. Reg.

64746, and again re-issued it on September 29, 2008 ("2008 MSGP") (73 Fed. Reg. 56527).

34.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), provides that the EPA

Administrator may authorize a state to issue NPDES permits in accordance with the

requirements of the CWA.

Maine Multi-Sector General Permit

35.     On January 12, 2001, the Administrator granted the State of Maine the authority

to issue Maine Pollutant Discharge Elimination System ("MEPDES") permits for all areas of the

State other than Indian country, pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

36.     Section 402(p), 33 U.S.C. § 1342(p), EPA's implementing regulation, 40 C.F.R.

§ 122.26(a)(1)(ii), and Section 9(a)(1)(ii) of the State of Maine Department of Environmental

Protection ("MEDEP") Rules concerning Applications for Waste Discharge Licenses, 06-096

C.M.R. 521(9)(a)(1)(ii), require facilities discharging stormwater "associated with industrial

activity" to be authorized by a permit.

37.     40 C.F.R. § 122.26(b)(14)(vi) and Chapter 521, Section 9(b)(14)(vi) of the

MEDEP Rules concerning Applications for Waste Discharge Licenses, 06-096 C.M.R.

521(9)(b)(14)(vi), specify that "storm water discharge associated with industrial activity"

includes facilities involved in the recycling of materials, including metal scrap yards, battery

reclaimers, salvage yards, and automobile junkyards, including but not limited to those classified

as Standard Industrial Classification 5093.

38.     On October 11, 2005, MEDEP issued an MEPDES Multi-Sector General Permit

for Stormwater Discharge Associated with Industrial Activity ("2005 ME MSGP").  Although

the expiration date for the 2005 MEMGSP was originally set for October 11, 2010, it remained

6

in effect until April 26, 2011, the effective date of the 2011 ME MSGP.  The expiration date of the 2011 ME MSGP is April 26, 2016.

39.     Under the 2005 ME MSGP and the 2011 ME MSGP, a facility discharging storm water "associated with industrial activities" is required to, among other things: submit a Notice of Intent to comply with the general permit ("NOI"); prepare and implement a Storm Water Pollution Prevention Plan ("SWPPP"); conduct inspections and monitoring; prepare reports; keep records; and train employees.

40.     The 2005 ME MSGP requires a quarterly visual examination of stormwater discharge.  The samples collected for the quarterly visual examination must be collected within the first 60 minutes (but no later than 2.25 hours) of runoff or snowmelt discharge from a facility.  All samples must be collected from the discharge resulting from a storm event that is greater than 0.1 inches in magnitude and that occurs at least 72 hours from a previously measureable (greater than 0.1 inch rainfall) storm event.

41.     The 2011 ME MSGP defines a "qualifying storm event" as "a storm event that is either precipitation, ice or snow melt that produces a measurable discharge at an outfall that occurs at least 72 hours from a previous measurable storm event."

42.     On information and belief, there was at least one qualifying "storm event" within the meaning of the 2005 ME MSGP and at least one "qualifying storm event" within the meaning of the 2011 Maine MSGP during each quarter that violations are alleged in this complaint.

Spill Prevention Control and Countermeasure Plan

43.     Section 311(j)(1) of the Act, 33 U.S.C. § 1321(j)(1), provides that the President

shall issue regulations "establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil and hazardous substances . . . from onshore and offshore facilities, and to contain discharges . . ."

44.     Under the authority of Section 311(j)(1) of the Act, the Oil Pollution Prevention regulations, found at 40 C.F.R. Part 112, establish procedures, methods, and requirements for preventing the discharge of oil.  These requirements apply to owners or operators of non-transportation-related facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil or oil products which, due to their location, could reasonably be expected to discharge oil in harmful quantities (as defined in 40 C.F.R. Part 110) to navigable waters of the United States or adjoining shorelines.  40 C.F.R. § 112.1(b).

45.     Under 40 C.F.R. § 112.3(a)(1), an owner or operator of an onshore facility that became operational prior to August 16, 2002 and that has discharged or, due to its location, could reasonably be expected to discharge, oil in harmful quantities into or upon the navigable waters of the United States must prepare and fully implement an SPCC plan in accordance with 40 C.F.R. § 112.7.

<u>Enforcement Authorities</u>

46.     Under Sections 309 and 402(i) of the CWA, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority to enforce violations of state-issued CWA permits.

47.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the commencement of a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) or 308 of the CWA, 33 U.S.C. §§ 1311(a) and 1318, or

any condition of limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

48.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the Act, 33 U.S.C. § 1311, or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed the specified maximum penalty per day for each violation. Pursuant to Section 309(d) of the CWA and 40 C.F.R. § 19.2, the maximum daily penalty for CWA violations, at all relevant times for each violation alleged in this complaint, is $37,500.

49.     The CWA Section 311(b)(7)(C), 33 U.S.C. § 1321(b)(7)(C), authorizes the commencement of an action for civil penalties against any person who fails or refuses to comply with any regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

## THE FACILITIES AND OPERATIONS

### Topsham Facility

50.     Since 1992, Defendants have operated a facility located at 80 Pejepscot Village, Topsham, Maine.  The facility, formerly a paper mill, includes former mill buildings, a wastewater collection system including piping, a sump pump located in the basement of the old mill building ("basement sump"), and a former waste water treatment facility.

51.     Defendants conduct scrap metal recovery and recycling operations on the site, including but not limited to, the processing and shredding of ferrous and non-ferrous metals.

52.     At relevant times Defendants have operated large shredders at the Topsham Facility.

53.     Operations at the Topsham Facility are subject to Maine permitting requirements,

including ME MSGP Sector N, for metal scrapyards, SIC 5093.

54.     Stormwater discharged from the Topsham Facility contains pollutants including, but not limited to, solids, total petroleum hydrocarbons ("TPH"), and metals, including but not limited to, aluminum, arsenic, cadmium, copper, cyanide, lead, mercury, nickel, silver, and zinc.

Topsham Outfall 1

55.     Defendants use the former mill's wastewater collection and treatment system ("Stormwater System") to collect and discharge stormwater from the primary stockpiling and metal processing areas at the Topsham facility ("Topsham Basin 1").

56.     In Topsham Basin 1, stormwater flows by gravity into catchbasins that drain to the basement sump.

57.     From the basement sump, stormwater is pumped to the old mill's former aeration basins, two large tanks that each holds approximately 1.465 million gallons.

58.     The stormwater then flows from the aeration basins to two former clarifiers, which are two additional large tanks that each holds approximately 170,517 gallons.

59.     From the clarifiers, stormwater flows to a sluiceway in the basement of the old treatment works building.

60.     From the sluiceway, stormwater overtops a weir (i.e., a barrier in the tank) and then enters a pipe that extends underground to the river bed of the Androscoggin River.

61.     The stormwater enters the Androscoggin River from a diffuser pipe ("Topsham Outfall 1").

62.     The Androscoggin River joins the Kennebec River at Merrymeeting Bay then flows into the Gulf of Maine of the Atlantic Ocean.  All are waters of the United States.

Topsham Outfall 2

63.     A second stormwater Basin at the Topsham Facility ("Topsham Basin 2") is used for vehicle parking, outside storage of structural steel components, and road maintenance.

64.     An access road for trucks entering and exiting the site carrying scrap metal is also located within Topsham Basin 2.

65.     Sometimes, debris and scrap metal fall from the primary stockpiling and metal processing areas located in Topsham Basin 1 onto the access road in Topsham Basin 2.

66.     Stormwater from Topsham Basin 2 is collected in catchbasins.

67.     Stormwater from those catchbasins collects within a manhole.

68.     Stormwater is automatically pumped from the manhole through two pipes and into the Androscoggin River ("Topsham Outfall 2"), a water of the United States.


Topsham Oil Containment

69.     At all times relevant to the allegations in this Complaint, Defendants engaged in storing, using, and consuming oil or oil products located at the Topsham Facility within the meaning of 40 C.F.R. § 112.2.

70.     At all times relevant to the allegations in this Complaint, the Topsham Facility had an aggregate above ground oil storage capacity greater than 1,320 gallons in containers with shell capacities of at least 55 gallons.

71.     The Topsham Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

72.     The Topsham Facility became operational prior to August 16, 2002.

73.     The Topsham Facility is a "non-transportation-related" facility within the meaning of Appendix A to 40 C.F.R. Part 112, as incorporated by reference within 40 C.F.R. § 112.2.

74.     Accordingly, the Topsham Facility is a non-transportation-related onshore facility.  On information and belief, and due to its location, the Topsham Facility could reasonably be expected to discharge oil to navigable waters of the United States or its adjoining shorelines in a harmful quantity.

75.     Defendants are therefore subject to the Oil Pollution Prevention regulations at 40 C.F.R. Part 112 at the Topsham Facility.

**Lewiston Facility**

76.     Since approximately 1985, the Lewiston Facility has been in operation at 50 River Road, Lewiston, Maine.

77.     Defendants conduct scrap metal recovery and recycling operations on the site, including but not limited to, the processing and shredding of ferrous and non-ferrous metals.

78.     At relevant times, until at least July of 2015, Defendants operated a shear bailer to cut larger metal objects into smaller pieces at the Lewiston Facility.

79.     When in operation, the shear bailer was fueled by #2 diesel stored in a 1,200 gallon tank.

80.     Operations at the Lewiston Facility are subject to Maine permitting requirements, including ME MSGP Sector N, for metal scrapyards, SIC 5093.

81.     Stormwater discharged from the Lewiston Facility contains pollutants including, but not limited to, solids and TPH.

82.     Materials received at the Lewiston facility contain pollutants, including but not limited to, aluminum, copper, iron, lead, and zinc.

83.     Stormwater that contacts materials stored and activities conducted at the Lewiston Facility may be exposed to pollutants described in Paragraphs 81 and 82.

84.     Stockpiles of metal scrap and other metal storage areas including, but not limited to, roll-off containers of metal components may contain metals and solids.


Lewiston Driveway Discharge Location

85.     Stormwater from a majority of the industrial activities at the Lewiston Facility, including scrap metal storage and scrap metal processing, flows down the driveway of the facility.

86.     This includes stormwater that falls on stockpiled scrap metal and other industrial materials placed adjacent to the maintenance garage, which then flows down the driveway.

87.     The stormwater flows from the Lewiston Facility driveway to River Road ("Driveway Discharge Location").

88.     The stormwater is then channeled along the eastern side of River Road where the road meets a curb.

89.     Where the curb ends, approximately 150 feet from the driveway, the stormwater continues on the road and/or flows into a roadside swale.

90.     The stormwater flows approximately 250 feet along the road and/or roadside swale to a pipe.

91.     The stormwater travels through the pipe and into Hart Brook.

92.     Hart Brook, a perennial stream, flows into the Androscoggin River, which joins the Kennebec River at Merrymeeting Bay, which flows into the Gulf of Maine of the Atlantic Ocean.  All are waters of the United States.

Lewiston Northeast Slope Discharge Location

93.     At relevant times, scrap metal was stored on the crest of an earthen berm on the north side of the property.

94.     At relevant times, industrial materials were stored on the crest of an earthen berm on the north side of the property.

95.     Stormwater flows from the crest of the earthen berm down the northeast slope of the property through an earthen gulley approximately 50 feet long.

96.     The gulley conveys stormwater into a small channel approximately 10 feet long.

97.     The channel conveys stormwater into Hart Brook ("Northeast Slope Discharge Location"), a water of the United States.

Lewiston Northwest Discharge Location

98.     Grimmel Inc. stockpiles snow plowed at the Lewiston Facility at the northwest corner of the property near River Road.

99.     Grimmel Inc. plows snow stockpiled in the northwest corner at the Lewiston Facility from the driveway and from scrap metal processing areas, including where scrap metal is weighed, sorted, and stored.

100.     Stormwater, including meltwater from stockpiled snow, flows into a small gully at the northwest corner of the property.

101.    The stormwater travels approximately 15 feet in the small gully then enters Hart Brook ("Northwest Discharge Location"), a water of the United States.

Lewiston Oil Containment

102.    At all times relevant to the allegations in this Complaint Defendants engaged in storing, using, and consuming "oil" or oil products located at the Lewiston Facility within the meaning of 40 C.F.R. § 112.2.

103.    At all times relevant to the allegations in this Complaint, the Lewiston Facility had an aggregate above ground oil storage capacity greater than 1,320 gallons.

104.    The Lewiston Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

105.    The Lewiston Facility became operational prior to August 16, 2002.

106.    The Lewiston Facility is a "non-transportation-related" facility within the meaning of Appendix A to 40 C.F.R. Part 112, as incorporated by reference within 40 C.F.R. § 112.2.

107.    Accordingly, the Lewiston Facility is a non-transportation-related onshore facility.  Upon information and belief, and due to its location, the Lewiston Facility could reasonably be expected to discharge oil to navigable waters of the United States or its adjoining shorelines in a harmful quantity.

108.    Defendants are therefore subject to the Oil Pollution Prevention regulations at 40 C.F.R. Part 112 at the Lewiston Facility.

## GENERAL ALLEGATIONS

109.   On February 2, 2006, "Grimmel Industries" applied for coverage for stormwater discharges associated with industrial activity from the Topsham facility under the 2005 ME MSGP.

110.   On February 10, 2006, the State of Maine authorized Grimmel L.L.C. to discharge stormwater associated with industrial activity from the Topsham facility pursuant to the 2005 ME MSGP (Permit number MER05B731).

111.   On May 4, 2011, "Grimmel Industries LLC" applied for coverage for stormwater discharges associated with industrial activity from the Topsham facility under the 2011 ME MSGP.

112.   On June 15, 2011, the ME DEP authorized "Grimmel Industries LLC" to discharge stormwater from the Topsham facility under the 2011 ME MSGP (Permit number MER05B731).

113.   On October 24, 2005, Gary T. Grimmel, "Owner", submitted an NOI on behalf of "Grimmel Industries" for coverage for stormwater discharges associated with industrial activity from the Lewiston facility under the 2005 ME MSGP.

114.   Gary Grimmel signed the certification statement on the NOI described in Paragraph 113, as a "responsible official" for "Grimmel Industries."

115.   The $300 permit fee for the NOI described in Paragraph 113 was paid for by an entity called "Grimmel's Car Crushing."

116.   On December 13, 2005, the State of Maine authorized "Grimmel Industries" to discharge stormwater associated with industrial activity from the Lewiston facility pursuant to the 2005 ME MSGP (Permit number MER05B340).

117.    On May 19, 2011, "Grimmel Industries LLC" applied for coverage for stormwater discharges associated with industrial activity from the Lewiston facility under the 2011 ME MSGP.

118.    On June 15, 2011, the ME DEP authorized "Grimmel Industries LLC" to discharge stormwater under the 2011 ME MSGP (Permit number MER05B340).

119.    On September 27, 2011, Defendants responded to an EPA information request and informed EPA that Grimmel Inc. was the operator at the Topsham facility.

120.    On September 27, 2011, Defendants responded to an EPA information request and informed EPA that Grimmel L.L.C. was the operator at the Lewiston facility.

121.    On August 7, 2013, Defendants responded to an EPA information request and informed EPA that Grimmel Inc. was the operator at the Topsham and Lewiston facilities.

122.    Gary Grimmel is a unifying link between Grimmel Inc. and Grimmel L.L.C.

123.    Grimmel Inc. is a closely held corporation.

124.    Grimmel L.L.C. is a closely held corporate entity.

125.    Gary Grimmel is listed as the owner and permit point of contact on the Lewiston 2005 NOI.

126.    Gary Grimmel is listed as the permit point of contact for the Lewiston 2011 NOI.

127.    At relevant times, Gary Grimmel has received correspondence from the State of Maine regarding environmental compliance at the Topsham and Lewiston facilities.

128.    On information and belief, at relevant times herein, Gary Grimmel managed, directed, or made decisions about environmental compliance at the Topsham and Lewiston facilities.

129.    Gary Grimmel had responsibility and authority either to prevent or promptly correct the violations alleged in this Complaint, and failed to do so.

130.    Gary Grimmel is a responsible corporate officer under the CWA regarding the violations alleged in this Complaint.


**FIRST CLAIM FOR RELIEF**
**(Topsham Facility – Permit Violations for Insufficient SWPPP)**

131.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 130.

132.    Among other things, the 2005 ME MSGP (Part IV.F.) and the 2011 ME MSGP (Part V.D.), requires permittees to prepare and implement a SWPPP containing specific elements.  From at least October 22, 2009 through the present, the SWPPP for the Topsham Facility was insufficient as follows:

    a.  Deficient Site Map.  The site map lacked required features (e.g., insufficient or non-existent labeling of stormwater conveyances, locations of structural best management practices ("BMPs"), and failure to list all above-ground storage tanks), in violation of the 2005 ME MSGP (Part IV.F.2.b. and Appendix N.4.a.) and the 2011 ME MSGP (Part V.D.3. and Appendix N.D.1.);

    b.  Failure to sufficiently identify and describe BMPs appropriate for the facility.  For Basin 1, from October 22, 2009 through at least August 2013, Defendants failed to identify and describe BMPs including, but not limited to, sweeping, catch basin silt sacks and maintenance, use of oil absorbent booms, measures to prevent off-site tracking, and schedules for BMP implementation.  For Basin 2 Defendants failed to identify and describe BMPs by incorrectly stating that no industrial activities occur in Basin 2 and by failing to identify and describe sweeping; catch basin and

silt socks maintenance; measures to prevent off-site tracking; and schedules for implementation of sweeping, paving and catch basin maintenance.  For both Basins 1 and 2, these failures violated the 2005 ME MSGP (Part IV.F.7.b.i. and ii) and the 2011 ME MSGP (Part V.D.9.a. and b.); and

c.   Failure to maintain an updated SWPPP.  With respect to the deficiencies listed in subparts a. and b. of this Paragraph, Defendants failed to timely and accurately update the SWPPP in violation of the 2005 ME MSGP (Part IV.L.) and the 2011 ME MSGP (Part V.K.).

133.   Defendants failed to comply with the 2005 ME MSGP and 2011 ME MSGP as described in Paragraph 132.

134.   As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

### SECOND CLAIM FOR RELIEF
**(Topsham Facility – Permit Violations for
Failure to Maintain BMPs in Effective Operating Condition)**

135.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 134.

136.   The 2005 ME MSGP (Part IV.G. and Appendix N.4.b.3.) and 2011 ME MSGP (Parts V.D.9.a. and V.E. and Appendix N.D.4.) require that all BMPs identified in the SWPPP must be maintained in effective operating condition.

137.   On November 5, 2012, an EPA inspector observed that catch basin covers in the processing area were covered in silt and sediment.

138.    On November 5, 2012, an EPA inspector observed that catch basins at the Topsham Facility contained no silt socks, which are fabric filters that are used to catch sediments and solids to filter stormwater.

139.    The 2005 ME MSGP (Part IV.F.7.b.i. and Appendix N.4.b.5.) and 2011 ME MSGP (Parts V.C.3. and V.D.9.a. and Appendix N.D.4.) require that permittees must regularly inspect, test, maintain and repair all industrial equipment, systems and BMPs to prevent situations that may result in leaks, spills, or other releases of pollutants.

140.    The 2005 ME MSGP (Appendix N.4.b.3.) and the 2011 ME MSGP (Appendix N.D.4.) require that the facility must develop procedures to minimize contact of stormwater with residual cutting fluids, including BMP options such as oil water separators ("OWS"), or their equivalents.  If a facility employs an OWS or its equivalent, it must, among other things, have a schedule to maintain the OWS or its equivalent.

141.    Defendants stockpile metal turnings exposed to cutting fluids outdoors.

142.    The stockpiles described in the previous paragraph are exposed to stormwater.

143.    Defendants use a large catch basin that they describe as "essentially an "Oil and Water Separator" to collect stormwater from the turnings stockpile.

144.    Additionally, Defendants use the basement of the process building as a settling chamber and a trap for oil and grease.

145.    Defendants also use the aeration basins and clarifiers from the former treatment works as settling and detention basins.

146.    In June 2011, a ME DEP inspector observed an oil sheen being discharged into the treatment works and directed Defendants to inspect and properly maintain its pump and settling area, and to keep records of these actions.

147.    On November 5, 2012, an EPA inspector observed a leaky oil reservoir that appeared to be the source of oil residue covering the floor and saturating the cement in the building that housed the motor to the old shredder.  Two holes, one in the floor and one near the bottom of a wall, are located in close proximity to the leaky oil reservoir.  The wall and floor surrounding the holes were heavily stained with oil.  Drip pans located to capture leaking oil were full of oil.

148.    On November 5, 2012, an EPA inspector observed oil absorbent booms partially submerged in the basement sump.

149.    On November 5, 2012, an EPA inspector observed that water flowing to the basement sump was light brown and semi-transparent.

150.    On November 5, 2012, an EPA inspector observed oil absorbent booms partially submerged in the old treatment works.

151.    On November 5, 2012, an EPA inspector observed an oily sheen of approximately 40 square feet surrounding the discharge point from the former aeration basin.

152.    Defendants do not regularly inspect, test, maintain and repair all industrial equipment, systems and BMPs to prevent situations that may result in leaks, spills, or other releases of pollutants.

153.    Defendants have an insufficient schedule to maintain its oil water separator equivalent in violation of the 2005 ME MSGP and the 2011 ME MSGP because the schedule only indicates maintenance will be performed as needed, and no such maintenance records were observed.

154.    Defendants failed to comply with the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 136 through 153.

155.     As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

### THIRD CLAIM FOR RELIEF
#### (Topsham Facility – Permit Violations for
#### Failure to Perform Good-Housekeeping Procedures)

156.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 155.

157.     The 2005 ME MSGP (Part IV.A. and F.7.b.i. and Appendix N.4.b.2-3.) and 2011 ME MSGP (Part V.C.2. and Appendix N.D.4.) require permittees to adequately "perform good housekeeping procedures, and keep all exposed areas that are potential sources of pollutants clean and orderly."

158.     The 2005 ME MSGP (Part IV.A. and F.7.b.i. and Appendix N.4.b.2-3.) and the 2011 ME MSGP (Part V.C.2. and Appendix N.D.4.) require permittees to adequately "[i]mplement at regular intervals, measures such as sweeping impervious areas."

159.     On November 5, 2012, an EPA inspector observed that the processing yard was covered in varying degrees of silt, sediment, and metal scraps.

160.     On November 5, 2012, the EPA inspector observed that a catchbasin cover at the foot of the unsorted material stockpile was potentially clogged.  After clearing the cover of debris, the water inside the catchbasin was murky, unclear, and had observable floatables.

161.     On November 5, 2012, the EPA inspector observed that another catch basin in the processing area also contained "murky" water.

162.     On November 5, 2012, the inspection showed the need for improved sweeping and better housekeeping.

163.    On November 5, 2012, the EPA inspector observed scrap materials and sediments in the access road and parking area in Topsham Basin 2.  The EPA inspector observed that the paved areas around the basins leading to Outfall #2 were laden with fine sediments and sand.

164.    During the November 5, 2012 inspection, Defendants' employees informed the EPA inspector that scrap piles beside the shredder area contained scrap from multiple days of operations.

165.    The foregoing Paragraphs 157 through 164 demonstrate that Defendants failed to perform good housekeeping procedures at the Topsham Facility, and therefore, Defendants failed to comply with the requirements of the 2005 ME MSGP and the 2011 ME MSGP.

166.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### FOURTH CLAIM FOR RELIEF
### (Topsham Facility – Permit Violations for
### Failure to Conduct or Properly Conduct Benchmark Monitoring)

167.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 166.

168.    The 2011 ME MSGP (Part VI.G. and Appendix N., Part F and Part VIII.L.4) requires that permittees conduct quarterly benchmark monitoring for three parameters, total suspended solids ("TSS"), TPH, and pH.

169.    Defendants failed to conduct benchmark monitoring for Topsham Outfall #1 in each of the quarters specified in Appendix 1 to this complaint.

170.    Defendants failed to properly conduct benchmark monitoring for Topsham Outfall #1 in each of the quarters specified in Appendix 1 to this complaint, as described therein.

171.    Defendants failed to conduct benchmark monitoring for Topsham Outfall #2 in each of the quarters specified in Appendix 1 to this complaint.

172.    Defendants failed to properly conduct benchmark monitoring for Topsham Outfall #2 in each of the quarters specified in Appendix 1 to this complaint, as described therein.

173.    Defendants failed to comply with the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 168 through 172 and Appendix 1 to this complaint.

174.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### FIFTH CLAIM FOR RELIEF
### (Topsham Facility – Permit Violations for
### Failure to Conduct Quarterly Visual Monitoring)

175.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 174.

176.    The 2005 ME MSGP (Part V.A.1.) and the 2011 ME MSGP (Part VI.B.) require that permittees conduct quarterly visual monitoring of stormwater discharges.

177.    Defendants failed to conduct quarterly visual monitoring for Topsham Outfall #1 in each of the quarters specified in Appendix 2 to this complaint.

178.     Defendants failed to properly conduct quarterly visual monitoring for Topsham Outfall #1 in each of the quarters specified in Appendix 2 to this complaint, as described therein.

179.    Defendants failed to conduct quarterly visual monitoring for Topsham Outfall #2 in each of the quarters specified in Appendix 2 to this complaint.

180.    Defendants failed to properly conduct quarterly visual monitoring for Topsham Outfall #2 in each of the quarters specified in Appendix 2 to this complaint, as described therein.

181.    Defendants failed to conduct or properly conduct quarterly visual monitoring required by the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 176 through 180 and Appendix 2 to this complaint.

182.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### SIXTH CLAIM FOR RELIEF
#### (Topsham Facility – Permit Violations for
#### Failure to Properly Perform ME DEP-Required Monitoring)

183.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 182.

184.    The 2011 ME MSGP (Part VI.D) authorizes the ME DEP to require additional monitoring.

185.    By letter dated June 29, 2011, ME DEP informed Defendants that monthly onsite analytical sampling was required at the point where water enters the old treatment system and at the discharge point where visual monitoring is conducted for the following pollutants of concern: TPH; mercury; polychlorinated biphenyls ("PCBs"); and toxic metals including aluminum, arsenic, cadmium, copper, cyanide, lead, nickel, silver, and zinc.

186.    Every month between June 2011 and December 2015, Defendants failed to conduct sampling at the point where water enters the old treatment system because Defendants have never sampled from that location.

187.    Defendants failed to properly conduct sampling at the discharge point where visual monitoring is conducted in each of the months specified in Appendix 3 to this complaint, as described therein.

188.    Defendants have failed to perform sampling required by ME DEP pursuant to the 2011 ME MSGP as described in Paragraphs 184 through 187 and Appendix 3 to this complaint.

189.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### SEVENTH CLAIM FOR RELIEF
**(Topsham Facility – Permit Violations for Failure to Conduct Quarterly Site Evaluations)**

190.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 189.

191.    The 2005 ME MSGP (Part II.E.) required quarterly site inspections called "Compliance Site Evaluations."

192.    The 2011 ME MSGP (Part V.I.) requires that permittees conduct quarterly site inspections, also called "Site Compliance Evaluations" ("SCE").  This part of the ME MSGP provides that there must be at least 60 days between each SCE.

193.    Defendants failed to conduct quarterly site inspections during the following quarters: 4th Quarter of 2009; 1st Quarter of 2010; 2nd Quarter of 2010; 3rd Quarter of 2010; 4th Quarter of 2012; 1st Quarter of 2011; and 2nd Quarter of 2011.

194.    In the alternative, if Defendants conducted quarterly site inspections during any of the quarters listed in the paragraph above, then Defendants failed to properly prepare reports and keep records as required by the 2005 ME MSGP (Parts II.E. and II.D. respectively).

195.    Defendants failed to properly conduct SCEs during the 2nd Quarter of 2012 and 4th Quarter of 2012 because there were less than 60 days between the previous SCEs.

196.    Defendants failed to conduct or properly conduct quarterly site inspections required by the 2005 ME MSGP and the 2011 ME MSGP, as described in Paragraphs 191 through 195.

197.     As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## EIGHTH CLAIM FOR RELIEF
### (Topsham Facility – Violations for Failure to Comply with SPCC Requirements)

198.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 197.

199.     Defendants' SPCC Plan was deficient in the following respects.

200.     As of the November 5, 2012, inspection, Defendants' SPCC Plan did not include a complete list of oil storage containers with a capacity of 55 gallons or more and the types of oil in each container as required by 40 C.F.R. § 112.7(a)(3)(i).

201.     As of the November 5, 2012, inspection, Defendants' SPCC Plan did not include an estimated number of mobile or portable containers, the types of oil contained in each and the capacity of each as required by 40 C.F.R. § 112.7(a)(3)(i).

202.     The SPCC Plan failed to identify Outfall #2 as a drainage pathway of the 1200 gallon diesel fuel tank.

203.     As of the November 5, 2012, inspection, Defendants had no records of specific SPCC training.

204.     As of the November 5, 2012, inspection, Defendants had not conducted quarterly tank inspections.

205.     Secondary containment and oil spill control measures are set forth in 40 C.F.R. § 112.6(a)(3)(i) and (ii); 112.7(c) and 112.9(c)(2).

206.     On November 5, 2012, an EPA inspector observed that a number of tanks and oil-filled operational equipment lacked secondary containment.

207.    Defendants' SPCC Plan stated that leaks and spills would enter catch basins and then the old treatment works.  The plan further provides that containment of a spill would be achieved by use of "absorbent pads and booms to prevent oil from discharging to the Androscoggin River."  The Plan likewise relies on booms as a spill control measure.

208.    On November 5, 2012, an EPA inspector observed that Grimmel Industries did not maintain several of the oil booms, as alleged in paragraphs 148 and 149, above.

209.    On November 5, 2012, an EPA inspector observed that an oil reservoir in the shredder building leaked resulting in oil residue covering the floor and saturating the cement, and that two drip pans were full of oil.

210.    On November 5, 2012, an EPA inspector observed that the hose for the 1000 gallon diesel fuel tank located to the north of the receiving area was hanging outside of the secondary containment creating an oily spot on the ground outside of the containment structure.

211.    By failing to maintain and fully implement the SPCC plan for the Facility in accordance with the requirements of 40 C.F.R. §§ 112.7 and 112.8, as described above in Paragraphs 199 through 210, Defendants violated 40 C.F.R. § 112.3 and Section 311(j) of the CWA, 33 U.S.C. § 1321(j), from at least October 22, 2009 through April 29, 2014.

212.    As alleged in Paragraphs 46-49, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### NINTH CLAIM FOR RELIEF
**(Lewiston Facility – Permit Violations for Insufficient SWPPP)**

213.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 212.

214.    Among other things, the 2005 ME MSGP (Part IV.F.) and the 2011 ME MSGP (Part V.D.), requires permittees to prepare and implement a SWPPP containing specific

elements.  From at least October 22, 2009 through the present, the SWPPP for the Lewiston

Facility was insufficient as follows:

    a.   Deficient Site Map: the site map lacked required features (e.g., locations of

        structural BMPs, processing equipment locations, locations of industrial

        equipment, location of above-ground storage tanks, material storage in uncovered

        trailers and on berms and slope on north side of facility, and impervious surfaces)

        in violation of the 2005 ME MSGP (Part IV.F.2.b. and Appendix N.4.a.) and the

        2011 ME MSGP (Part V.D.3. and Appendix N.D.1.); and

    b.   Failure to sufficiently identify and describe structural BMPs appropriate for the

        facility in violation of the 2005 ME MSGP (Part IV.F.7.b.i. and ii) and of the

        2011 ME MSGP (Part V.D.9.a. and b.) by incorrectly stating that all industrial

        activities occur in a single drainage basin.

215.    Defendants failed to comply with the 2005 ME MSGP and the 2011 ME MSGP,

as described in Paragraph 214.

216.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for

injunctive relief and civil penalties for violating the terms and conditions of its permit.


<u>**TENTH CLAIM FOR RELIEF**</u>
**(Lewiston Facility – Permit Violations for
Failure to Minimize Exposure of Stormwater to Industrial Activities)**

217.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 216.

218.    The 2005 ME MSGP (Part IV.A. and Appendix N.4.b.2-3.) and the 2011 ME

MSGP (Part V.C.1. and Appendix N.D) require permittees to "minimize exposure of the

manufacturing process, and material or product storage areas to stormwater (where practicable)

by locating industrial activities and materials inside or by protecting them with storm resistant coverings."

219.     Stormwater that falls on the shear baler and on areas just south of the shear baler flows by the corner of the maintenance garage where the runoff is exposed to oily dirt and residue.

220.     On March 13, 2013, an EPA Inspector observed an oil sheen on stormwater flowing from the roof drain of the maintenance garage through a processing area at the Lewiston facility.

221.     On March 13, 2013, an EPA inspector observed that a trailer filled with metal debris (mainly vehicle starter coils) was positioned at the crest of the berm above Hart Brook. The trailer was open, exposed to the elements, and would permit rainwater to contact the contents of the trailer before leaking out.

222.     On September 12, 2013 during a subsequent inspection, an EPA Inspector observed that even though Defendants covered the trailer containing metal scrap with a tarp, the cover was not maintained, thereby exposing the contents to the elements.

223.     On March 13, 2013, an EPA inspector observed that, in addition to the trailer located on top of the berm, there were various pieces of scrap metal and other debris on top of the berm and strewn down the slope toward Hart Brook.

224.     Defendants failed to comply with the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 218 through 223.

225.     As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## ELEVENTH CLAIM FOR RELIEF
### (Lewiston Facility – Permit Violations for
### Failure to Perform Good-Housekeeping Procedures)

226.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 225.

227.    The 2005 ME MSGP (Part IV.A. and F.7.b.i. and Appendix N.4.b.2-3.) and the 2011 ME MSGP (Part V.C.2. and Appendix N.D.4.) require permittees to "perform good housekeeping procedures, and keep all exposed areas that are potential sources of pollutants clean and orderly."

228.    The 2005 ME MSGP (Part IV.A. and F.7.b.i. and Appendix N.4.b.2-3.) and the 2011 ME MSGP (Part V.C.2. and Appendix N.D.4.) require permittees to adequately "[i]mplement at regular intervals, measures such as sweeping impervious areas…."

229.    On March 13, 2013, an EPA inspector observed that the yard was covered in varying degrees of silt, sediment, and metal scraps.

230.    On March 13, 2013, an EPA inspector observed that there was no indication that the driveway was swept.

231.    On March 13, 2013, an EPA inspector observed that highly silted water was ponding close to the weigh station.

232.    The site manager stated to the EPA inspector that in severe rain events stormwater flows past the weigh scales to their south, and down the driveway.

233.    Defendants failed to perform good housekeeping procedures at the Lewiston Facility, as described in Paragraphs 227 through 232, and therefore, Defendants failed to comply with the 2005 ME MSGP and the 2011 ME MSGP.

234.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

31

## TWELFTH CLAIM FOR RELIEF
### (Lewiston Facility – Permit Violations for
### Failure to Maintain BMPs in Effective Operating Condition)

235.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 234.

236.    The 2005 ME MSGP (Part IV.G. and Appendix N.4.b.3) and the 2011 ME MSGP (Parts V.D.9.a. and V.E. and Appendix N.D.4.) require that all BMPs identified in the SWPPP must be maintained in effective operating condition.

237.    On March 13, 2013, an EPA inspector observed a "slight oil sheen" on the ground immediately downstream of an oil-absorbent boom placed in the stormwater flow path from the shear baler.

238.    The SWPPP, under the heading of "Sediment and Erosion Control," states that hay bales or silt fence will be "properly installed" if warranted.

239.    On March 13, 2013, an EPA inspector observed two sets of silt fences along the bank of Hart Brook.

240.    One set of the fencing described in Paragraph 239 was flattened with snow and sand was deposited on top of it.

241.    The other set of fencing described in Paragraph 239 was not installed correctly (e.g., the bottom of the fence was not touching the ground) and it was compromised in places (rendering it ineffective).

242.    Defendants failed to comply with the 2005 ME and the 2011 ME MSGP as described in Paragraphs 236 through 241.

243.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

**THIRTEENTH CLAIM FOR RELIEF**
**(Lewiston Facility – Permit Violations for**
**Failure to Conduct or Properly Conduct Benchmark Monitoring**
**and Take Corrective Action)**

244.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 243.

245.     The 2011 ME MSGP (Part VI.G. and Appendix N., Part F and Part VIII.L.4.)

requires that permittees quarterly conduct benchmark monitoring for the following three

parameters: TSS (100 mg/L benchmark); Total Petroleum Hydrocarbons; and pH.

246.     The 2011 ME MSGP (Part VI.G.2-4. and Appendix N., Part F) requires

permittees to average the results of four quarterly samples.  If the average of any parameter

exceeds the benchmark, the permittee shall review the selection, design, and implementation of

control measures and complete a corrective action report.  Additional sampling is then required

and depending on the results of such sampling, further corrective action may be required as well.

247.     Defendants failed to conduct benchmark monitoring for the Lewiston Northeast

Slope Discharge Location and Lewiston Northwest Discharge Location every quarter between

the 3rd Quarter of 2011 and the present.

248.     Defendants failed to conduct benchmark monitoring for the Lewiston Driveway

Discharge Location every quarter between the 3rd Quarter of 2011 and the present, except for the

2nd Quarter of 2012.

249.     Defendants failed to properly conduct benchmark monitoring for the Lewiston

Driveway Discharge Location for the 2nd Quarter of 2012 because the sampling did not include

pH, and improperly sampled diesel range organics ("DRO") in place of TPH.

250.     Additionally, for the benchmark monitoring event in the previous paragraph, the

sampling result for total suspended solids was 271 mg/l, above the benchmark standard of 100

mg/l.

33

251.     Defendants failed to take benchmark samples in the other quarters for 2012, as required by the 2011 ME MSGP to obtain an average value over a four-quarter period, therefore the average benchmark sample for total suspended solids during 2012 (271 mg/l) exceeded the benchmark standard (100 mg/l).

252.     Defendants did not take corrective action related to the benchmark exceedance described in Paragraphs 250-251.

253.     Defendants failed to conduct and/or properly conduct benchmark monitoring, and take corrective action for an exceedance as required by the 2011 ME MSGP as described in Paragraphs 245 through 252.

254.     As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


**FOURTEENTH CLAIM FOR RELIEF**
**(Lewiston Facility – Permit Violations for**
**Failure to Conduct or Properly Conduct Quarterly Visual Monitoring)**

255.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 254.

256.     The 2005 ME MSGP (Part V.A.1.) and the 2011 ME MSGP (Part VI.B.) requires that permittees conduct quarterly visual monitoring of stormwater discharges.

257.     Defendants failed to conduct quarterly visual monitoring for the Lewiston Driveway Discharge Location in each of the quarters specified in Appendix 4 to this complaint.

258.     Defendants failed to properly conduct quarterly visual monitoring for the Lewiston Driveway Discharge Location in each of the quarters specified in Appendix 4 to this complaint, as described therein.

259.    Defendants failed to conduct quarterly visual monitoring for the Lewiston Northeast Slope Discharge Location every quarter between the 4th Quarter of 2009 and at least the 2nd Quarter of 2013.

260.    Defendants failed to conduct quarterly visual monitoring for the Lewiston Northwest Discharge Location every quarter between the 4th Quarter of 2009 and at least the 2nd Quarter of 2013.

261.    Defendants failed to conduct or properly conduct quarterly visual monitoring required by the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 256 through 260 and Appendix 4 to this complaint.

262.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


**FIFTEENTH CLAIM FOR RELIEF**
**(Lewiston Facility – Permit Violations for**
**Failure to Conduct or Properly Conduct Quarterly Site Evaluations)**

263.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 262.

264.    The 2005 ME MSGP (Part II.E.) required quarterly site inspections called "Compliance Site Evaluations."

265.    Defendants failed to conduct quarterly site inspections during the following quarters: 4th Quarter of 2009; 1st Quarter of 2010; 2nd Quarter of 2010; 3rd Quarter of 2010; 4th Quarter of 2012; 1st Quarter of 2011; and 2nd Quarter of 2011.

266.    In the alternative, if Defendants conducted quarterly site inspections during any of the quarters listed in the paragraph above, then Defendants failed to properly prepare reports and keep records as required by the 2005 ME MSGP (Parts II.E. and II.D. respectively).

267.    The 2011 ME MSGP (Part V.I.) requires that permittees conduct quarterly site inspections, also called "Site Compliance Evaluations" ("SCE").  This part of the ME MSGP provides that at least one SCE per year must be conducted within 24 hours of a qualifying storm event, and there must be at least 60 days between each SCE.

268.    The 2011 ME MSGP (Part IX.X.) provides that a "qualifying storm event" is defined as a storm event that is either precipitation, ice or snow melt that produces a measurable discharge at an outfall that occurs at least 72 hours from a previous measurable storm event.

269.    Defendants failed to properly conduct an SCE during the 4th Quarter of 2012 because it did not conduct an SCE during 2012 within 24 hours of a qualifying storm event.

270.    Defendants failed to properly conduct an SCE during the 1st Quarter of 2013 because that SCE was conducted less than 60 days from the previous SCE.

271.    Defendants failed to perform quarterly site inspections as required by the 2005 ME MSGP (Part II.E.) perform SCEs as required by the 2011 ME MSGP (Part V.I.) as described in Paragraphs 264 through 270.

272.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.


### SIXTEENTH CLAIM FOR RELIEF
**(Lewiston Facility – Permit Violations for
Failure to Properly Conduct Employee Training)**

273.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 272.

274.    The 2005 ME MSGP (Part IV.F.7.b.i) and the 2011 ME MSGP (Parts V.D.9.a. and V.J.5) require that permittees provide annual training to all staff that work in areas where industrial material or activities are exposed to storm water and for employees that are responsible

36

for implementing activities identified in the SWPPP; that such training be comprised of specific prescribed components set forth in those provisions; and that permittees keep certain documents on site with the facility's SWPPP, including records of annual employee training, including topics covered, training date(s), and printed names and signatures of participating employees.

275.    From 2009 through 2013, upon information and belief, Defendants employed five people at the Lewiston Facility, and that these employees worked in areas where industrial material or activities are exposed to water, and/or were employee responsible for implementing activities identified in the SWPPP.

276.    Training records for 2011 and 2012 reflect that only one employee attended training in each of those years.

277.    Defendants failed to comply with training requirements set forth in the 2005 ME MSGP and the 2011 ME MSGP as described in Paragraphs 274 through 276.

278.    As alleged in Paragraphs 46-48, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## SEVENTEENTH CLAIM FOR RELIEF
### (Lewiston Facility – Failure to Maintain and Fully Implement SPCC Plan)

279.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 278.

280.    Upon information and belief, as of at least October 22, 2009, the Lewiston Facility contained oil storage capacity that required creating, maintaining, and implementing an SPCC Plan.

281.    Upon information and belief, the Lewiston Facility did not have an SPCC Plan until August 24, 2012.

282.    Between August 24, 2012 and August 8, 2013 (the date EPA determined Defendants had a sufficient SPCC Plan) Defendants' SPCC Plan was deficient in the following respects:

      a.    Defendants' SPCC Plan did not include a complete list of oil storage containers with a capacity of 55 gallons or more as required by 40 C.F.R. § 112.7.(a)(3)(i.); and

      b.    the SPCC Plan inaccurately stated that two tanks were contained when they were not.

283.    On March 13, 2013, an EPA inspector observed that there was no secondary containment for two 275-gallon motor oil tanks.

284.    On March 13, 2013, an EPA inspector reviewed an above-ground storage tank (AST) inspection form dated 12/13/07 stating that double-walled tanks had been ordered but a facility employee informed the EPA inspector during the inspection that this had never occurred. AST inspection forms dated Sept. 25, 2012, Dec. 21, 2012 and Jan. 23, 2013 state that new tanks and secondary containment had been ordered.

285.    On March 13, 2013, an EPA inspector observed that there was no secondary containment for four 55-gallon drums.

286.    On September 12, 2013, Defendants provided EPA with documentation that secondary containment was in place for all tanks requiring containment.

287.    As of March 13, 2013, there were no records of specific SPCC training at the Lewiston Facility.

288.    Defendants began conducting AST inspections and preparing AST inspection forms at the Lewiston Facility as early as January 11, 2011.

289.    Defendants failed to properly conduct SPCC Inspection and adequately document such inspections through the use of, among other things, AST inspection forms between January 11, 2011 and June 27, 2013 (the date EPA determined Defendants were properly conducting and documenting such inspections).

290.    By failing to develop, maintain, and fully implement an SPCC plan for the Facility in accordance with the requirements of 40 C.F.R. §§ 112.7 and 112.8, as described above in Paragraphs 280 through 289, Defendants violated 40 C.F.R. § 112.3 and Section 311(j) of the CWA, 33 U.S.C. § 1321(j):

a.    from at least October 22, 2009 through August 23, 2012, for Defendants' failure to have an SPCC Plan;

b.    from August 24, 2012 through August 8, 2013, for Defendants' failure to develop a sufficient SPCC Plan;

c.    from at least October 22, 2009 through September 12, 2013, for Defendants' failure to provide secondary containment for all subject tanks;

d.    from January 11, 2011 through June 27, 2013, for Defendants' failure to properly conduct and document SPCC inspections; and

e.    from at least October 22, 2009 through March 13, 2013, for Defendants' failure to provide SPCC training to employees.

291.    As alleged in Paragraphs 46-49, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of its permit.

## <u>RELIEF SOUGHT</u>

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1.      Order Defendants to comply with all applicable requirements of the Clean Water Act and its implementing regulations including the 2011 ME MSGP and any subsequent permits issued to Defendants.

2.      Order Defendant to pay civil penalties not to exceed $37,500 per day for each violation;

3.      Award the United States all costs and disbursements of this action; and

4.      Grant such other relief as the Court deems just and proper.


Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

Dated: <u>4/1/16</u>      <u> /s/ Bradley L. Levine </u>
BRADLEY L. LEVINE
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Ben Franklin Station P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-1513
bradley.levine@usdoj.gov


THOMAS E. DELAHANTY II
United States Attorney for the District of Maine

JOHN OSBORN
United States Attorney's Office
Chief, Civil Division

Of Counsel:

Kathleen E. Woodward
Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Squire
Boston, MA 02109